RANDY S. GROSSMAN
Acting United States Attorney
Daniel C. Silva
Michael A. Deshong
Assistant United States Attorneys
California Bar No. 264632 / 301041
Federal Office Building
880 Front Street, Room 6293
San Diego, California 92101-8893
Telephone: (619) 546-9713
Email: daniel.c.silva@usdoj.gov

Attorneys for United States of America

MAY  4 2021

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                                    DEPUTY

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | Case No. 21 cr 1319-TWR |
|---|---|
| Plaintiff, | |
| v. | PLEA AGREEMENT |
| MARCO ANTONIO GONZALEZ, | |
| Defendant. | |

IT IS HEREBY AGREED between the plaintiff, UNITED STATES OF AMERICA, through its counsel, RANDY S. GROSSMAN, Acting United States Attorney, and Daniel C. Silva and Michael A. Deshong, Assistant United States Attorneys, and Defendant MARCO ANTONIO GONZALEZ, with the advice and consent of Martha M. Hall, counsel for Defendant, as follows:

## I
## THE PLEA

### A.    THE CHARGE

Defendant agrees to waive Indictment and plead guilty to an Information charging Defendant with willful violation of the Bank Secrecy Act, in violation of Title 31, United States Code, Sections 5322 and 5318(h)(1)(A).

### PROSECUTION OF ADDITIONAL COUNTS

In exchange for Defendant's plea of guilty, the United States agrees not to prosecute additional criminal charges against Defendant based on information now known to the

Plea Agreement

Def. Initials MAG

1  United States related to Defendant's criminal operation of MRK Casa de Cambio, and
2  financial transactions related thereto. Nothing in this agreement, however, shields
3  Defendant from prosecution for any act or omission not now known to the United States
4  or committed after the date of this agreement. Should Defendant commit perjury or give
5  false statement, the United States, at its sole discretion, will be free to prosecute Defendant
6  for that offense, move to set aside this plea agreement, and be relieved of its obligations
7  under this agreement.

## II
## NATURE OF THE OFFENSE

### A.    ELEMENTS EXPLAINED

The offense to which Defendant is pleading guilty has the following elements:

1.    Beginning no later than 2015 and continuing through at least July 2020, defendant was aware that Title 31, United States Code, Section 5318(h)(1)(A) required a money transmitting business/money services business to establish an anti-money laundering program that included, at a minimum, the development of internal policies, procedures, and controls to detect and prevent money laundering and other violations of law;

2.    Defendant was further aware that establishing and implementing an anti-money laundering program for a money transmitting business/money services business under Title 31, United States Code, Section 5318(h)(1)(A) required adherence to and compliance with regulations issued thereunder, including Title 31, Code of Federal Regulations, Section 1022.210 ("Anti-money laundering programs for money services business") and the obligations referred to and prescribed therein; and

3.    Defendant knowingly, voluntarily, and willfully acted to violate Title 31, United States Code, Section 5318(h)(1)(A) and the regulations issued thereunder, including willfully violating Title 31, Code of Federal Regulations, Section 1022.210, by failing to establish and implement one or more of the minimal requirements of an anti-money laundering program with internal policies, procedures, and controls to detect and prevent money laundering and other violations of law, all in violation of Title 31, United States Code, Sections 5322 and 5318(h)(1)(A).

### B.    ELEMENTS UNDERSTOOD AND ADMITTED – FACTUAL BASIS

Defendant has fully discussed the facts of this case with defense counsel. Defendant has committed each element of the crime and admits that there is a factual basis for this

guilty plea. The following facts are true and undisputed, and applied at all times during the subject time period:

1. Since no later than 2002, and continuing until the present, defendant MARCO ANTONIO GONZALEZ conducted, controlled, managed, supervised, directed, and owned all or part of a money transmitting business, also referred to as a money services business (an "MTB/MSB") offering money transmitting services at its branches in the United States of America and Mexico. GONZALEZ's MTB/MSB has continuously operated under the name "MRK Casa de Cambio" ("MRK") since no later than 2003.

2. MRK's primary money transmitting services in the United States of America and Mexico were as a check casher, currency exchanger, money transmitter, and a physical importer, exporter, or other transferor of value or currency into the United States of America from Mexico, as well as into Mexico from the United States of America.

<u>Legal Background—The Bank Secrecy Act</u>

3. At all times while defendant MARCO ANTONIO GONZALEZ operated MRK, the Currency and Foreign Transactions Reporting Act (Title 31, United States Code, Section 5313 *et seq*. and the regulations proscribed thereunder, also known as the "Bank Secrecy Act" (or the "BSA")) imposed reporting requirements on the vast majority of transactions involving more than $10,000 in United States currency and other monetary instruments. The Bank Secrecy Act further imposed due diligence, suspicious activity reporting, and other processes and procedures on financial institutions (including an MTB/MSB like MRK) that would provide "a high degree of usefulness in criminal, tax, or regulatory investigations or proceedings...." Title 31, United States Code, Section 5311. These obligations included, but were not limited to, developing and maintaining an adequate and effective anti-money laundering ("AML") program. *See* Title 31, United States Code, Section 5318(g), and the regulations issued thereunder.

4. Title 31, Code of Federal Regulations, Section 1022.210(b) required an MTB/MSB develop and maintain an AML program that was "commensurate with the risks posed by the location and size of, and the nature and volume of the financial services

3

Def. Initials *MAG*

provided by, the money services business." At Title 31, United States Code, Section 1022.210(d), the Bank Secrecy Act further required that an MTB/MSB's AML program, "[a]t a minimum":

a.    "Incorporate policies, procedures, and internal controls reasonably designed to assure compliance with" the Bank Secrecy Act, as well as preparing and filing with the Secretary of the Treasury reports of transactions required under the Bank Secrecy Act;

b.    "Designate a person to assure day to day compliance with the program and" the Bank Secrecy Act;

c.    "Provide education and/or training of appropriate personnel concerning their responsibilities under the program, including training in the detection of suspicious transactions to the extent that the money services business is required to report such transactions under" the Bank Secrecy Act; and

d.    "Provide for independent review to monitor and maintain an adequate program. The scope and frequency of the review shall be commensurate with the risk of the financial services provided by the money services business."

### BSA Reports

5.    Title 31, United States Code, Section 5316 and the regulations issued thereunder required every person (or an agent or bailee of any person) to file a report with the Secretary of the Treasury when the person, agent, or bailee knowingly: (1) transports, is about to transport, or has transported, monetary instruments of more than $10,000 at one time—(A) from a place in the United States to or through a place outside the United States or (B) to a place in the United States from or through a place outside the United States; or (2) receives monetary instruments of more than $10,000 at one time transported into the United States from or through a place outside the United States.

6.    The report that a person must file with the Secretary of the Treasury in compliance with Title 31, United States Code, Section 5316 was Financial Crimes Enforcement Network Form 105, Report of International Transportation of Currency and Monetary Instruments (a "CMIR") with the Financial Crimes Enforcement Network ("FinCEN"), a branch of the Department of the Treasury.

7.    Among other information that must appear on a CMIR, Title 31, United States

1  Code, Section 5316(b)(2) required the person importing currency must provide "the origin,
2  destination, and route of the monetary instruments". It was a criminal offense under Title
3  31, United States Code, Section 5324(c)(2) for a person to file or cause or attempt to cause
4  a person to file a report required under section 5316 (i.e., a CMIR) that contains a material
5  omission or misstatement of fact.

6                    Money Transmitting Business/Money Services Business

7         8.     Title 31, United States Code, Section 5330 and the regulations issued
8  thereunder required any person who owns or controls an MTB to register the business with
9  the Secretary of the Treasury not later than the end of the 180-day period beginning on the
10 date on which the business is established.

11        9.     Title 31, Code of Federal Regulations, 1010.100 *et seq.*, required additional
12 types of "money services businesses" to register under Title 31, United States Code,
13 Section 5330 as an MTB where the Secretary of the Treasury determined those businesses
14 and the persons controlling those businesses were engaged in "money transmission
15 services". Title 31, Code of Federal Regulations, Section 1010.100(ff)(5)(i)(A).

16        10.    Title 31, Code of Federal Regulations, Section 1010.100(ff)(5)(i)(A) defined
17 "money transmission services" as the acceptance of currency, funds, or other value that
18 substitutes for currency from one person and the transmission of currency, funds, or other
19 value that substitutes for currency to another location or person by any means.

20        11.    Title 31, Code of Federal Regulations, Section 1022.380(a)(3) required an
21 MTB that engaged in money transmission services—both on its own behalf and as an agent
22 for others—to register as an MTB under Title 31, United States Code, Section 5330.

23                       Registering, or Failing to Register, an MTB

24        12.    An MTB/MSB registered with the Secretary of the Treasury by preparing and
25 filing FinCEN Form 107 "Registration of Money Service Business" (an "RMSB"). The
26 person filing an RMSB was required to include all information set forth in Title 31, United
27 States Code, Section 5330(b), any other information requested on the MTB/MSB
28 registration form, and in the manner and to the extent required by the Secretary of the

1 Treasury. Title 31, Code of Federal Regulations, Section 1022.380(b)(1)(i); *see also*
2 https://www.fincen.gov/registration-form.

3     13.   A branch office of an MTB/MSB was not required to file its own RMSB. The
4 MTB/MSB that filed an RMSB was, however, required to report information about its
5 branch locations or offices as provided by the instructions to the RMSB, including those
6 based outside of the United States of America. Title 31, Code of Federal Regulations,
7 Section 1022.380(b)(1)(ii) & 1022.380(a)(2); *see also* https://www.fincen.
8 gov/registration-form.

9     14.   The RMSB that FinCEN has used since approximately 2013 required an
10 MTB/MSB registrant to report all "U.S. States and/or territories where the registrant, its
11 agents or branches are physically located and/or providing MSB activities", and further
12 required the registrant to "check as many state/territory boxes as appropriate", including
13 "foreign location(s)" if the MTB/MSB "engages in activities in foreign locations (non-U.S.
14 and US Territories)."

15     15.   The RMSB that FinCEN has used since approximately 2013 further required
16 an MTB/MSB registrant to provide the "registrant's primary transaction account", which
17 it defined as "the account that has the greatest annual dollar amount of money services
18 business activity."

19     16.   Title 31, United States Code, Section 5330(a)(4), captioned "False and
20 incomplete information", stated that "filing of false or materially incomplete information
21 in connection with the registration of a money transmitting business shall be considered as
22 a failure to comply with the requirements of this subchapter."

23     17.   Title 31, Code of Federal Regulations, Section 1022.380(e), captioned
24 "Consequences of failing to comply with 31 U.S.C. 5330 or the regulations thereunder",
25 similar stated that "failure to comply with the requirements of 31 U.S.C. 5330 or this
26 section includes the filing of false or materially incomplete information in connection with
27 the registration of a money services business."

28 / / /

Currency and Suspicious Transaction Reports

18.     In addition to filing complete and accurate RMSBs as part of an MTB/MSB's AML program, all financial institutions must further file currency and transaction reports—in addition to CMIRs—under the Bank Secrecy Act as follows:

a.     Currency Transaction Reports (FinCEN Form 112, a "CTR") for any currency transaction involving more than $10,000 in United States currency, pursuant to Title 31, United States Code, Section 5313, and Title 31, Code of Federal Regulations, Section 1022.311; and

b.     Suspicious Activity Reports (FinCEN Form 109, a "SAR", collectively with CMIRs, RMSBs, and CTRs, "BSA Reports") for any suspicious transaction relevant to a possible violation of law or regulation, pursuant to Title 31, United States Code, Section 5318(g); and Title 31, Code of Federal Regulations, Section 1022.320.

19.     BSA Reports provide transparency into the United States financial system and allow law enforcement to track the movement of large amounts of cash and other financial transactions. Businesses or individuals that import, transport, or transfer large amounts of currency without complying with these reporting requirements create opportunities for criminal organizations to introduce their profits into the financial system without full Bank Secrecy Act or AML scrutiny.

Defendant's Willful Violations of the Bank Secrecy Act

20.     Beginning no later than 2015, and continuing through at least July 2020, defendant MARCO ANTONIO GONZALEZ, MRK, and MRK's managers, employees, and agents, had knowledge of the obligations to prepare, and file with FinCEN, full, accurate, and timely information on all BSA Reports, as well as the duty to develop and maintain an adequate AML program, as required under Title 31, United States Code, Section 5318(g), and the regulations issued thereunder.

21.     Despite his knowledge of these obligation under the BSA, defendant MARCO ANTONIO GONZALEZ intentionally and willfully violated the BSA by knowingly providing false and materially incomplete information in connection with the registration of MRK as an MTB/MSB by: (i) failing to disclose MRK's Mexico-based offices and branches with the Secretary of the Treasury; and (ii) reporting false and materially

incomplete information in connection with the registration of MRK as an MTB/MSB.

22.     Beginning no later than 2015, and under the direction, management, and control of defendant MARCO ANTONIO GONZALEZ, MRK's money transmitting services included operating multiple branches of a currency exchange business in San Ysidro, California, which is within the Southern District of California, as well as in Tijuana, Mexico.

23.     Between no later than 2015 and continuing until at least July 2020, and under the direction, management, and control of defendant MARCO ANTONIO GONZALEZ, MRK's Tijuana, Mexico-based branches (the "Tijuana MRK Branches") regularly imported from Mexico cash, coins, and monetary instruments in various currency—primarily U.S. dollars and Mexican pesos—for the benefit of MRK and ultimate deposit into or exchange with other financial institutions and individuals based in the United States of America.

24.     Defendant MARCO ANTONIO GONZALEZ conducted, controlled, managed, supervised, directed, and owned all or part of the operations of the Tijuana MRK Branches. In doing so, and by failing to disclose, or otherwise materially omitting these operations on MRK's RMSBs filed with FinCEN between no later than 2015 and 2020, GONZALEZ knowingly, intentionally, and willfully failed to develop and maintain an adequate BSA/AML program for MRK's operations, in violation of Title 18, United States Code, Section 5318(g) and 5322.

25.     As part of his willful violations of the Bank Secrecy Act that began no later than 2015, defendant MARCO ANTONIO GONZALEZ caused MRK in the United States of America and Mexico to engage in cash transactions without applying adequate scrutiny to the source, purpose, ownership, or destination of the funds, or otherwise whether they were relevant to a possible violation of law or regulation—as required under Title 31, United States Code, Section 1022.320(a)(1). In doing so, GONZALEZ failed to adhere to best practices for all financial institutions; but, more specifically under Title 31, Code of Federal Regulations, Section 1022.210(b), which required an MTB/MSB to develop and

8

Def. Initials MAG

maintain an AML program that was "commensurate with the risks posed by the location and size of, and the nature and volume of the financial services provided by, the money services business", GONZALEZ failed to perform adequate and generally accepted "due diligence" and "know your customer" practices on transactions conducted at MRK's California- and Tijuana-based operations.

26.  As a result, in or about 2016, defendant MARCO ANTONIO GONZALEZ and MRK encountered individuals attempting to launder proceeds derived from narcotics trafficking. During one of these encounters, MRK received approximately $10,000 U.S. dollars that were proceeds of narcotics trafficking at the MRK branch in San Ysidro, California. In exchange, and under the direction, management, and control of GONZALEZ, MRK provided Mexican pesos for receipt at one of the Tijuana MRK Branches. No SAR, CMIR, or CTR was filed on this transaction, or series of transactions— all in willful violation of the Bank Secrecy Act.

27.  Beginning no later than 2002 and continuing until most recently on or about March 6, 2020, defendant MARCO ANTONIO GONZALEZ knowingly prepared and filed RMSBs with the Secretary of the Treasury that failed to report MRK's operations in Mexico, and the existence of Tijuana MRK Branches or other MRK offices located in Tijuana, Mexico.

28.  By failing to disclose any of MRK's branch locations or offices as required by the Secretary of the Treasury and the instructions on the RMSB, and as required under Title 31, Code of Federal Regulations, Section 1022.380(b)(1)(ii), defendant MARCO ANTONIO GONZALEZ prepared and filed knowingly false and materially incomplete information in connection with the registration of MRK as an MTB/MSB, which Title 31, United States Code, Section 5330(a)(4) states "shall be considered as a failure to comply with the requirements of this subchapter."

<u>MRK's False, Misleading, and Materially Inaccurate CMIRs</u>

29.  MRK—through its owners, managers, employees, and agents under the direction, management, and control of defendant MARCO ANTONIO GONZALEZ—

Def. Initials MNG

filed approximately 1,714 CMIRs from in and around July 2002 through July 13, 2020. The CMIRs filed over this time period on behalf of MRK represented the physical importation of currency, coins, and monetary instruments into the United States of America from Mexico with a total value of approximately $79,090,554.

30.    Between approximately 2013 and August 15, 2019, MRK—under the direction, management, and control of defendant MARCO ANTONIO GONZALEZ—maintained a primary bank account ending in x4547 with a bank ("Bank 1"), which operated in the Southern District of California and elsewhere (the "MRK Account"). There were limited bulk cash deposits into the MRK Account between its opening in 2013 and May 2016. Between May 2016 and its closure in August 2019, however, there were no less than $36,377,579 in cash deposits into the MRK Account.

31.    After the closure of the MRK Account on or about August 15, 2019, MRK—through its owners, managers, employees, and agents under the direction, management, and control of defendant MARCO ANTONIO GONZALEZ—filed approximately 64 separate CMIRs between November 18, 2019 and July 13, 2020 related to the importation of United States and Mexican currency from Mexico—for a total value of approximately $2,460,726 in currency and coins (the "False MRK CMIRs"). All of the False MRK CMIRs listed the destination of the imported currency (e.g., where it was being "shipped to") as Bank 1, at its address in the Southern District of California.

32.    MRK—and all of its owners, managers, employees, and agents involved in the preparation and filing of the False MRK CMIRs—were aware of the material misstatements of fact on the False MRK CMIRs about the destination of the imported currency and coins, and knew that no cash deposits were made into the MRK Account after its closure on or about August 15, 2019.

33.    Despite the material misstatements of fact on the False MRK CMIRs, during the time when MRK filed the False MRK CMIRs, MRK—through its owners, managers, employees, and agents under the direction, management, and control of defendant MARCO ANTONIO GONZALEZ—delivered no less than $4,094,935 in U.S. currency to another

1  MTB/MSB, which operated in the Southern District of California and elsewhere
2  ("MTB/MSB 2").

3       34.    MRK—under the direction, management, and control of defendant MARCO
4  ANTONIO GONZALEZ—falsely reported on its March 6, 2020 RMSB that a different
5  bank account at Bank 1 was MRK's "primary transaction account", which at the time of
6  filing GONZALEZ knew was false; and, in truth, MRK's "primary transaction account"
7  was at that time with MTB/MSB 2 or some other individual, business, or financial
8  institution. Due to this false and materially incomplete information in connection with the
9  registration of MRK as an MTB/MSB, Title 31, United States Code, Section 5330(a)(4)
10 held that its "shall be considered as a failure to comply with the requirements of this
11 subchapter."

12              Willful Violation of CTR and SAR Filing Obligations

13      35.    Beginning on an unknown date, but no later than January 2019, defendant
14 MARCO ANTONIO GONZALEZ, and other MRK managers, employees, and agents,
15 received cash in excess of $10,000 at MRK yet knowingly and intentionally inputted the
16 transactions into MRK's records in increments less than $1,000. Despite knowledge of the
17 obligation to file CTRs for cash transactions in excess of $10,000 on a single day, and the
18 obligation to obtain identification for transactions in excess of $2,000 (*see* Title 31, United
19 States Code, Section 1010.320(a)(2)), GONZALEZ and MRK recorded the cash
20 transactions in sub-$2,000 increments (often less than $1,000) to willfully evade the
21 obligations of an MTB/MSB to: file CTRs (under Title 31, Code of Federal Regulations,
22 Section 1022.310); obtain identification and additional scrutiny on the MRK customers
23 (under Title 31, Code of Federal Regulations, Section 1022.312); and evade the obligation
24 to investigate whether a SAR was required to be filed on MRK customers and transactions
25 (under Title 31, Code of Federal Regulations, Section 1022.320).

26      36.    Furthermore, despite defendant MARCO ANTONIO GONZALEZ's
27 knowledge that MRK had to file a SAR on suspicious transactions "no later than 30
28 calendar days after the date of the initial detection by the money services business of facts

1  that may constitute a basis for filing a SAR" (Title 31, Code of Federal Regulations, Section

2  1022.320(b)(3)), GONZALEZ caused MRK to file a single SAR between 2008 and 2020,

3  which nevertheless was filed more than 90 days after the date of MRK's initial detection

4  of the of facts formed the basis for filing the SAR, which GONZALEZ knew at the time

5  was its due date, and willfully failed to timely file with FinCEN.

### III
### PENALTIES

The crime to which Defendant is pleading guilty carries the following penalties:

A.   a maximum 5 years in prison;

B.   a maximum $500,000 fine;

C.   a mandatory special assessment of $100 per count; and

D.   a term of supervised release of up to 3 years. Failure to comply with any condition of supervised release may result in revocation of supervised release, requiring Defendant to serve in prison, upon revocation, all or part of the statutory maximum term of supervised release.

### IV
### DEFENDANT'S WAIVER OF TRIAL RIGHTS AND UNDERSTANDING OF CONSEQUENCES

This guilty plea waives Defendant's right at trial to:

A.   Continue to plead not guilty and require the United States to prove the elements of the crime beyond a reasonable doubt;

B.   A speedy and public trial by jury;

C.   The assistance of counsel at all stages;

D.   Confront and cross-examine adverse witnesses;

E.   Testify and present evidence and to have witnesses testify on behalf of Defendant;

F.   Not testify or have any adverse inferences drawn from the failure to testify;

G.   Defendant knowingly and voluntarily waives any rights and defenses defendant may have under the Excessive Fines Clause of the Eighth Amendment to the United States Constitution to the forfeiture of property in this proceeding or any related civil proceeding; and

H.   Assert now or on appeal, any legal, constitutional, statutory, regulatory, and

12

Def. Initials MA 6

1    procedural rights and defenses that he may have under any source of federal
2    or common law, including among others, challenges to personal jurisdiction,
    extraterritoriality, statute of limitations, venue, and the form and substance of
3    the Information, including specifically any claim of multiplicity or duplicity.

**V**

4
**DEFENDANT ACKNOWLEDGES NO PRETRIAL RIGHT TO BE**
5
**PROVIDED WITH IMPEACHMENT AND AFFIRMATIVE DEFENSE**
**INFORMATION**

6      Any information establishing the factual innocence of Defendant known to the
7 undersigned prosecutor in this case has been turned over to Defendant. The United States
8 will continue to provide such information establishing the factual innocence of Defendant.

9      If this case proceeded to trial, the United States would be required to provide
10 impeachment information for its witnesses. In addition, if Defendant raised an affirmative
11 defense, the United States would be required to provide information in its possession that
12 supports such a defense. By pleading guilty Defendant will not be provided this
13 information, if any, and Defendant waives any right to this information. Defendant will not
14 attempt to withdraw the guilty plea or to file a collateral attack based on the existence of
15 this information.

**VI**
16
**DEFENDANT'S REPRESENTATION THAT GUILTY**
17
**PLEA IS KNOWING AND VOLUNTARY**

18      Defendant represents that:

19    A.    Defendant has had a full opportunity to discuss all the facts and circumstances
          of this case with defense counsel and has a clear understanding of the charges
20          and the consequences of this plea. By pleading guilty, Defendant may be
          giving up, and rendered ineligible to receive, valuable government benefits
21          and civic rights, such as the right to vote, the right to possess a firearm, the
          right to hold office, and the right to serve on a jury. The conviction in this case
22          may subject Defendant to various collateral consequences, including but not
          limited to revocation of probation, parole, or supervised release in another
23          case; debarment from government contracting; and suspension or revocation
24          of a professional license, none of which can serve as grounds to withdraw
          Defendant's guilty plea.

25    B.    No one has made any promises or offered any rewards in return for this guilty
26          plea, other than those contained in this agreement or otherwise disclosed to
          the Court.

27    C.    No one has threatened Defendant or Defendant's family to induce this guilty
28          plea.

13
Def. Initials _MN_

D.    Defendant is pleading guilty because Defendant is guilty and for no other reason.

**VII**
**AGREEMENT LIMITED TO U.S. ATTORNEY'S OFFICE**
**SOUTHERN DISTRICT OF CALIFORNIA**

This plea agreement is limited to the United States Attorney's Office for the Southern District of California, and cannot bind any other authorities in any type of matter, although the United States will bring this plea agreement to the attention of other authorities if requested by Defendant.

**VIII**
**APPLICABILITY OF SENTENCING GUIDELINES**

The sentence imposed will be based on the factors set forth in 18 U.S.C. § 3553(a). In imposing the sentence, the sentencing judge must consult the United States Sentencing Guidelines (Guidelines) and take them into account. Defendant has discussed the Guidelines with defense counsel and understands that the Guidelines are only advisory, not mandatory. The Court may impose a sentence more severe or less severe than otherwise applicable under the Guidelines, up to the maximum in the statute of conviction. The sentence cannot be determined until a presentence report is prepared by the U.S. Probation Office and defense counsel and the United States have an opportunity to review and challenge the presentence report. Nothing in this plea agreement limits the United States' duty to provide complete and accurate facts to the district court and the U.S. Probation Office.

**IX**
**SENTENCE IS WITHIN SOLE DISCRETION OF JUDGE**

This plea agreement is made pursuant to Federal Rule of Criminal Procedure 11(c)(1)(B). The sentence is within the sole discretion of the sentencing judge who may impose the maximum sentence provided by statute. It is uncertain at this time what Defendant's sentence will be. The United States has not made and will not make any representation about what sentence Defendant will receive. Any estimate of the probable sentence by defense counsel is not a promise and is not binding on the Court. Any

1   recommendation by the United States at sentencing also is not binding on the Court. If the
2   sentencing judge does not follow any of the parties' sentencing recommendations,
3   Defendant will not withdraw the plea.

**X**

**PARTIES' SENTENCING RECOMMENDATIONS**

4
5   A.    SENTENCING GUIDELINE CALCULATIONS

6       Although the Guidelines are only advisory and just one factor the Court will consider
7   under 18 U.S.C. § 3553(a) in imposing a sentence, the parties will jointly recommend the
8   following Base Offense Level, Specific Offense Characteristics, Adjustments, and
9   Departures:

10      1.    Base Offense Level [USSG § 2S1.31(a)]                              8

11      2.    Acceptance of Responsibility [USSG § 3E1.1(a)]                   - 2

12  B.    ACCEPTANCE OF RESPONSIBILITY

13      Despite paragraph A above, the United States need not recommend an adjustment
14  for Acceptance of Responsibility if Defendant engages in conduct inconsistent with
15  acceptance of responsibility including, but not limited to, the following:

16      1.    Fails to truthfully admit a complete factual basis as stated in the plea at the
17            time the plea is entered, or falsely denies, or makes a statement inconsistent
              with, the factual basis set forth in this agreement;

18
19      2.    Falsely denies prior criminal conduct or convictions;

20      3.    Is untruthful with the United States, the Court or probation officer; or

21      4.    Breaches this plea agreement in any way.

22  C.    FURTHER   ADJUSTMENTS   AND   SENTENCE   REDUCTIONS
        INCLUDING THOSE UNDER 18 U.S.C. § 3553

23      Defendant may request or recommend additional downward adjustments,
24  departures, or variances from the Sentencing Guidelines under 18 U.S.C. § 3553. The
25  United States may oppose any downward adjustments, departures, or variances not set forth
26  in Section X, paragraph A above.

27  D.    NO AGREEMENT AS TO CRIMINAL HISTORY CATEGORY

28      The parties have **no** agreement as to Defendant's Criminal History Category.

E.   "FACTUAL BASIS" AND "RELEVANT CONDUCT" INFORMATION

The facts in the "factual basis" paragraph of this agreement are true and may be considered as "relevant conduct" under USSG § 1B1.3 and as the nature and circumstances of the offense under 18 U.S.C. § 3553(a)(1).

F.   PARTIES' RECOMMENDATIONS REGARDING CUSTODY

The United States will recommend that Defendant be sentenced to the low end of the advisory Guidelines range recommended by the United States at sentencing.

G.   SPECIAL ASSESSMENT AND FINE

1.   Special Assessment

The parties will jointly recommend that Defendant pay a special assessment in the amount of $100.00 per felony count of conviction to be paid forthwith at time of sentencing. Special assessments shall be paid through the office of the Clerk of the District Court by bank or cashier's check or money order made payable to the "Clerk, United States District Court."

2.   Fine/Forfeiture

Based on a separate forfeiture of approximately $20,000 by Defendant, the parties agree to recommend no fine be imposed on Defendant.

H.   SUPERVISED RELEASE

If the Court imposes a term of supervised release, Defendant will not seek to reduce or terminate early the term of supervised release until Defendant has served at least 2/3 of the term of supervised release and has fully paid and satisfied any special assessments, fine, criminal forfeiture judgment, and restitution judgment.

## XI
## DEFENDANT WAIVES APPEAL AND COLLATERAL ATTACK

Defendant waives (gives up) all rights to appeal and to collaterally attack every aspect of the conviction and sentence, including any restitution or forfeiture order. This waiver includes, but is not limited to, any argument that the statute of conviction or Defendant's prosecution is unconstitutional and any argument that the facts of this case do not constitute the crime charged. The only exceptions are 1) Defendant may appeal a

16

Def. Initials MA6

1 custodial sentence above the high end of the guideline range recommended by the United

2 States at sentencing (if USSG § 5G1.1(b) applies, the high end of the range will be the

3 statutorily required mandatory minimum sentence), and 2) Defendant may collaterally

4 attack the conviction or sentence on the basis that Defendant received ineffective assistance

5 of counsel. If Defendant appeals, the United States may support on appeal the sentence or

6 restitution order actually imposed.

## XII
## BREACH OF THE PLEA AGREEMENT

9     Defendant and Defendant's attorney know the terms of this agreement and shall

10 raise, before the sentencing hearing is complete, any claim that the United States has not

11 complied with this agreement. Otherwise, such claims shall be deemed waived (that is,

12 deliberately not raised despite awareness that the claim could be raised), cannot later be

13 made to any court, and if later made to a court, shall constitute a breach of this agreement.

14     Defendant breaches this agreement if Defendant violates or fails to perform any

15 obligation under this agreement. The following are non-exhaustive examples of acts

16 constituting a breach:

17     1.     Failing to plead guilty pursuant to this agreement;

18     2.     Failing to fully accept responsibility as established in Section X, paragraph B,
19              above;

20     3.     Failing to appear in court;

21     4.     Attempting to withdraw the plea;

22     5.     Failing to abide by any court order related to this case;

23     6.     Appealing (which occurs if a notice of appeal is filed) or collaterally attacking
24              the conviction or sentence in violation of Section XI of this plea agreement;
              or

25     7.     Engaging in additional criminal conduct from the time of arrest until the time
26              of sentencing.

27     If Defendant breaches this plea agreement, Defendant will not be able to enforce any

28 provisions, and the United States will be relieved of all its obligations under this plea

agreement. For example, the United States may proceed to sentencing but recommend a different sentence than what it agreed to recommend above. Or the United States may pursue any charges including those that were dismissed, promised to be dismissed, or not filed as a result of this agreement (Defendant agrees that any statute of limitations relating to such charges is tolled indefinitely as of the date all parties have signed this agreement; Defendant also waives any double jeopardy defense to such charges). In addition, the United States may move to set aside Defendant's guilty plea. Defendant may not withdraw the guilty plea based on the United States' pursuit of remedies for Defendant's breach.

Additionally, if Defendant breaches this plea agreement: (i) any statements made by Defendant, under oath, at the guilty plea hearing (before either a Magistrate Judge or a District Judge); (ii) the factual basis statement in Section II.B in this agreement; and (iii) any evidence derived from such statements, are admissible against Defendant in any prosecution of, or any action against, Defendant. This includes the prosecution of the charge(s) that is the subject of this plea agreement or any charge(s) that the prosecution agreed to dismiss or not file as part of this agreement, but later pursues because of a breach by the Defendant. Additionally, Defendant knowingly, voluntarily, and intelligently waives any argument that the statements and any evidence derived from the statements should be suppressed, cannot be used by the United States, or are inadmissible under the United States Constitution, any statute, Rule 410 of the Federal Rules of Evidence, Rule 11(f) of the Federal Rules of Criminal Procedure, and any other federal rule.

## XIII
## CONTENTS AND MODIFICATION OF AGREEMENT

This plea agreement embodies the entire agreement between the parties and supersedes any other agreement, written or oral. No modification of this plea agreement shall be effective unless in writing signed by all parties.

## XIV
## DEFENDANT AND COUNSEL FULLY UNDERSTAND AGREEMENT

By signing this agreement, Defendant certifies that Defendant has read it (or that it has been read to Defendant in Defendant's native language). Defendant has discussed the

Def. Initials MN 5

1  terms of this agreement with defense counsel and fully understands its meaning and effect.

## XV
## DEFENDANT SATISFIED WITH COUNSEL

Defendant has consulted with counsel and is satisfied with counsel's representation. This is Defendant's independent opinion, and Defendant's counsel did not advise Defendant about what to say in this regard.

RANDY S. GROSSMAN
Acting United States Attorney

May 4, 2021
_____
DATED

_____
DANIEL C. SILVA
MICHAEL A. DESHONG
Assistant U.S. Attorney

3-9-21
_____
DATED

_____
MARTHA M. HALL
Defense Counsel

**IN ADDITION TO THE FOREGOING PROVISIONS TO WHICH I AGREE, I SWEAR UNDER PENALTY OF PERJURY THAT THE FACTS IN THE "FACTUAL BASIS" SECTION ABOVE ARE TRUE.**

3-9-21
_____
DATED

_____
MARCO ANTONIO GONZALEZ
Defendant

Approved By:

LEAH R. BUSSELL
Assistant U.S. Attorney

Plea Agreement

19

Def. Initials MAG